Filed 4/26/16  In re D.T. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re D.T., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>D.J.,<br><br>　　　Defendant and Appellant. | A146578<br><br>(Humboldt County<br>Super. Ct. No. JV130086) |

**INTRODUCTION**

Mother appeals from the juvenile court's order terminating her parental rights to the minor D.T. (Welf. & Inst. Code, § 366.26.)[1]  She argues the trial court abused its discretion by refusing to find circumstances warranting application of the continuing beneficial relationship and sibling relationship exceptions to termination of parental rights codified in section 366.26, subdivisions (c)(1)(B)(i) and (c)(1)(B)(v).  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951–952.)  We affirm the court's order.

---

[1] Unless otherwise specified all further statutory references are to the Welfare and Institutions Code.

**STATEMENT OF HISTORICAL AND PROCEDURAL FACTS[2]**

"D.T. was born February . . . 2011.  D.T.'s mother (mother) has three older children." [3]  Between 2000 and 2010, the family had been in and out of the juvenile dependency system due to allegations of general neglect.  On May 13, 2010, the Humboldt County Department of Health and Social Services (Department) substantiated an allegation that one of mother's friends had sexually abused one of her daughters.  In addition, between 2006 and 2011, mother suffered several misdemeanor and felony convictions.  In 2009 she was sentenced to prison on a felony drug offense, and in 2011 she was convicted of a misdemeanor violation of Penal Code section 273a, subdivision (a), child endangerment.

"[¶] . . . [¶]

"In July or August 2010, when she was approximately two months pregnant with D.T., mother began a relationship with Christine T.  Christine T. was present when mother gave birth in February 2011 and the baby was given Christine T.'s last name on the birth certificate.  Mother and Christine T. separated in September 2012.

"In May 2013, mother was arrested for possession of methamphetamine.  Upon her release, she took the girls out of school and disappeared with all the children.  The family was located on June 18, 2013, and the children were taken into protective

---

[2] The statements enclosed within quotation marks in the following summary are taken verbatim from our unpublished March 9, 2015 opinion in which we denied, on the merits, a writ petition by D.T.'s biological father challenging the court's refusal to grant him presumed father status and reunification services pursuant to *Adoption of Kelsey S.* (1992) 1 Cal.4th 816.  (*W.M. v. Superior Court* (Mar. 9, 2015, A143528.)  Facts pertaining to persons involved in the proceedings below but not germane to this appeal are omitted unless deemed necessary for continuity.

[3] Two of those children, daughters I.M. and T.B., are the siblings whose relationships with D.T. are at issue in this appeal.  The third child, son B.B., age 20 as of 2015, was not in mother's care at the time of the ensuing dependency proceedings involving D.T. or his sisters, and, so far as this record shows, has been out of mother's care for most of his life.

custody." (*W.M. v. Superior Court*, *supra*, A143528, at p. *2.)  That same day, D.T. and his two sisters were placed together in the same foster home.

### *"Petition*

"On June 20, 2013, the Department filed a juvenile dependency petition alleging D.T. came within the provisions of section 300, subdivisions (b) and (j), due to D.J.'s substance abuse history and her failure to follow through with the case plan ordered in the girls' dependency.[4]

"The children were detained. . . ."

"On July 2, 2013, the court appointed counsel for Christine T. in advance of the contested jurisdictional hearing. . . .  On July 26, 2013, Christine T. requested the court elevate her to the status of presumed mother.  (Fam. Code, § 7611, subd. (d).)

"Following mother's submission on a modified petition, the court found the allegations of the petition true and set hearings for determination of parentage and disposition.  On September 18, 2013, following a contested hearing on parentage issues, the court granted Christine T. presumed mother status.

### *"Disposition*

"In its disposition report dated October 10, 2013, the Department recommended denial of reunification services to mother and provision of reunification services for Christine T.  D.T.'s behavior caused the caretakers to express concerns he might be autistic and he was referred to the Redwood Coast Regional Center (RCDC) for evaluation.  Prior to November 18, 2013, D.T. was diagnosed with autism.

"A disposition hearing was held on December 10, 2013, at which the court granted reunification services to both mother and Christine T. . . ." (*W.M. v. Superior Court*, *supra*, A143528, at p. *3.)

---

[4] The Department concurrently filed section 387 petitions on behalf of I.M. and T.B.

The children's care provider decided she could no longer be a placement for all three children. On February 25, 2014, D.T. was moved to a new foster home. His two sisters were placed together in a different foster home. The Department's efforts to keep the children together were unsuccessful for, as a social worker later observed, "it is difficult to find a home that can provide permanency for sibling sets with large age differences, in addition to a home capable of meeting [D.T.]'s special needs."

"***Six-Month Review Hearing***

"A six-month review hearing was set for June 10, 2014. In its report dated May 29, 2014, the Department indicated D.T. was with a new foster family who was diligently pursuing services through the RCDC and was meeting his developmental needs. D.T. was making excellent progress and his behavior had improved. He appeared to trust his new caretakers and was comfortable with them. Due to health issues, Christine T.'s efforts toward reunification had been marginal, but she had stayed in contact with the Department, which recommended the court extend services for Christine until August 18, 2014, the 12-month benchmark. Mother had had no contact with the Department and had stopped visiting her son. The Department recommended the court terminate services to her." (*W.M. v. Superior Court*, *supra*, A143528, at p. *4.)

"At the six-month review hearing on July 16, 2014, the court terminated services to mother and extended services for Christine T. until August 12, 2014, the date of the 12-month review hearing.

"In its report prepared for the 12-month review hearing, the social worker reported Christine T. had lost contact with the Department, and had stopped visiting D.T. The Department recommended the court terminate services to Christine T. and set a section 366.26 hearing. . . ."

"At the review hearing held August 12, 2014, the court terminated services to Christine T. and set the section 366.26 hearing for December 10, 2014." (*W.M. v. Superior Court*, *supra*, A143528, at p. *5.)

4

D.T.'s new foster home was in Eureka, and he was reported to be comfortable with the new family. Mother continued to be offered two, two-hour supervised visits with D.T. each month, which D.T.'s sisters also attend.

*"Section 388 Petition and Hearing*

"On September 17, 2014, [W.M.] filed a written section 388 petition seeking a change of the court's orders terminating reunification services, setting the section 366.26 hearing, and continuing D.T. in foster care. [W.M.] averred he was first informed that mother had a child and that he might be the father in May 2014. DNA results confirmed W.M.'s paternity. He wanted the court to '[e]levate [him] to presumed father status or alternatively to *Kelsey S.* father status' and requested either custody of D.T. or reunification services. . . ." (*W.M. v. Superior Court*, *supra*, A143528, at p. *5.)

"A contested hearing was held on October 29, 2014." (*W.M. v. Superior Court*, *supra*, A143528, at p. *6.)

"[T]he trial court denied father's section 388 petition." (*W.M. v. Superior Court*, *supra*, A143528, at p. *8.)

The trial court also granted father's request for a stay of the section 366.26 hearing pending appellate review, and father filed a notice of intent to file a writ.

### *Subsequent Developments*

D.T.'s foster parents filed a request for de facto parent status. Mother filed an issue statement opposing termination of her parental rights on the grounds of the beneficial parental relationship and sibling relationship exceptions to the statutory preference for adoption. Mother indicated D.T.'s sisters were now in a legal guardianship. In December 2014, the trial court took off calendar the contested section 366.26 hearing and the de facto parent request pending an appellate ruling.

According to the post-permanency review report filed February 24, 2015, mother visited D.T. on December 5 and 19, 2014 and January 9, 2015. Another visit was scheduled for January 23, 2015. D.T. was also visiting with his sisters, along with

5

Mother, twice a month for two hours. "[D.T.] loves visiting with his sisters, and will sometimes say their names out of the blue at home."

This court denied W.M.'s writ petition and dissolved the stay on March 9, 2015. On May 12, 2015, the stay was lifted by the trial court and a contested section 366.26 hearing was set for September 9, 2015.

### Section 366.26 Hearing

The social worker's report for the section 366.26 hearing filed September 22, 2015, indicated mother continued to be offered two-hour supervised visits twice a month. However, mother's visits had been "sporadic and infrequent." There were no visits between February 20, 2015, and June 26, 2015. She visited again on July 9, 2015 and not at all in August 2015.

Mother brought her one-year-old daughter to the June 26 visit. D.T. smiled and hugged mother when he saw her for the first time in four months. Mother acted appropriately throughout the visit. At the end of the visit, D.T. acted angry and was uncooperative. He said something that sounded like "I hate you" when mother was buckling D.T. into his car seat. He did let her give him a goodbye hug.

The July 9 visit did not go as well. D.T. was reluctant to enter the building where the visit was to occur, started crying and acting tired about halfway through the visit, again told his mother he hated her at the end of the visit, and threw a temper tantrum on his way home. He stopped crying when he arrived home and appeared happy to see his foster parent.

The Department asked the court to order adoption as the permanent plan. Although the foster parents had "expressed some ambivalence about adoption" and inquired about legal guardianship in April 2015, at a meeting on July 18, 2015, with Department staff, the foster parents clarified they intended to adopt D.T., but did not want to start the process until February 2016. Their ambivalence and the timing of the adoption were "due to changing circumstances within their family" and "the needs and

6

present life stages of their other children," not doubts about D.T. According to the social worker, "[D.T.]'s foster parents have continuously expressed a strong commitment to [him]. They love him, consider him a member of their family, and cannot imagine him living anywhere else. They have clearly demonstrated the ability to meet his needs. [D.T.] considers them his parents, and is doing well in their home."

In an adoption assessment addendum to the 366.26 report filed September 22, 2015, the social worker noted D.T. "has had infrequent visitation with his mother going back at least one year." From February 20, 2015, to August 27, 2015, mother had visited D.T. four times: February 20, June 26, July 9, and August 13, 2015. Visits have remained supervised since D.T.'s detention on June 18, 2013.

Some of these visits included D.T.'s two older sisters. When the girls were present, mother focused her attention mainly on them, while D.T. spent most of the visits playing alone. Otherwise, mother interacted with D.T. appropriately, but D.T. did not always appear to enjoy the visits. After two of the visits, D.T. was overheard telling his mother, "I hate you." A visit at the park on August 13 was "more positive," but D.T. was happy to see his caretakers when he returned home.

In addition, D.T. visited with his sisters without mother. Visits were facilitated by a Department aide until March 2015, but since then the care providers had been arranging the visits. Visits were twice a month, often lasted more than two hours, sometimes involved extended outings, and generally went well. The children's respective caretakers were reportedly committed to continuing future visits between the siblings.

D.T. had been living with the current foster parents for almost one and one-half years, since February 25, 2014; he was reportedly happy and healthy and was thriving with them. He views them as "parental figures." D.T. remained a client of the Regional Center due to his autism diagnosis and received intensive one-on-one services through them. He was enrolled in a summer school program, on the waiting list for Head Start

7

and would be returning to his regular school in the Fall.  Mother was not involved in his services through the Regional Center or with his schooling.

For their part, the foster parents were strongly committed to D.T. and currently intended to adopt him, although they had at an earlier time inquired about legal guardianship.

In the social worker's opinion, "any attachment [D.T.] has to his mother does not confer a benefit sufficient to overcome the benefits that adoption will confer on [him].  The birth mother has not parented [D.T.] in over two years, did not have regular visits and contact with him, and never progressed to unsupervised visits.  [D.T.] does not look to his birth mother for safety, affection, or assurance.  He calls his substitute care providers mom and dad and looks to them for affection and to have his needs met."

As for D.T.'s sibling relationships, the social worker opined:  "[D.T.] does have a bond to his sisters, [but] this bond is insufficient when compared to the benefit of long term permanence through adoption.  Furthermore, [D.T.]'s foster parents value [D.T.'s] connection to his sisters and are committed to continue visitation with them into the future.  Likewise, his sister's [*sic*] foster parents are also committed to continuing visitation.  It is this adoption social worker's opinion that adoption will not interfere with [D.T.]'s connection or bond to his half-sisters."

The social worker deemed D.T. "an adoptable child who is placed in a home that will likely be approved for adoption," and recommended termination of mother's parental rights.

### *The Contested Section 366.26 Hearing*

The hearing commenced September 9, 2015; mother was not present.  After several continuances, the hearing concluded on September 22, 2015, after D.T.'s two sisters and the girls' legal guardian, A.B., and mother testified.

I.M., age 13, is in her last year of middle school.  She is not interested in baby-sitting and is "not really a kid person."

8

She last saw D.T. 10 or 11 days earlier. She testified she usually sees her brother once a month. For the past few months, visits have been once or twice a month. The visits are usually at his house and last three to four hours. They do not argue, and he is usually glad to see her, unless he is in a bad mood or has not had a good nap that day. Her guardian told her she could see him more often, but she is usually free only once a month.

D.T. is four years old. They don't share jokes, because "[h]is sense of humor isn't very big." He shows her his toy cars, and the tricks he can do on the trampoline. They share an appreciation for the movie "Cars." D.T. talks a lot more than he did the last time she saw him. He is generally a happy person. D.T. recognizes her, says hello, says her name, is usually glad to see her and is disappointed when she leaves. Once or twice he has started to cry. Asked how she felt about the possibility of D.T. being adopted into his current foster family, I.M. replied, "I feel, like, he shouldn't have to go through foster care his whole life and that it would be good for him."

T.B., age 9, is in the fourth grade. She testified she "like[s] [D.T.] a lot." She plays cars with him two hours a month. She knows D.T. is autistic, which means to her "[h]e was born with a little problem so it will take him, like, a while to understand words and a whole bunch of other stuff like that." But she gets along with him okay because she can communicate with him: "he can understand me." She likes "hanging out with him," and when they go to the beach she goes in the water with him.

D.T. seems happy at his foster parents' house. When she and her sister visit him, D.T. gets all excited, calls her name, runs up to her and "give[s] us hugs." T.B. does not fight with her brother; she is patient with him. Their visits are two hours long. After one hour, she takes a little break, then goes back to playing with him. He likes tickling games. When they leave, he sometimes cries and wants one more kiss and hug. T.B. sees him once a month, but she would see him more often if she could and she understands she could ask to spend more time with him.

9

A.B. is the girls' guardian and has had them in her care since February 10, 2014. She feels comfortable calling D.T.'s foster parents to set up visits. "We do not have scheduled visits because we're two families that are friends." They usually meet once a month and sometimes twice a month, depending on what else is going on. To her, D.T.'s foster family seems open to continuing the visits between the siblings, and she is herself committed to continuing them. Ten days earlier, the two families had an informal meeting to talk about ongoing contact between the siblings. I.M. stayed for two hours; T.B. stayed from 10:00 a.m. to 4:00 p.m.

Mother testified she last visited D.T. three weeks earlier at the Family Connection Center. Prior to that, she visited with him two weeks earlier. Mother's visitation schedule is two hours every other week and for the past couple of months she had been seeing D.T. "pretty much every other week." She had one visit with all three children at the beginning of the year.

D.T. calls her mom, and during the visits they "do all kinds of things. We play with cars. Art. We've actually gotten to go on one visit that was outside the center. Got to play at the park in Fortuna. We read. We cuddle. He asks me questions about things that are around the room. Asks me about his sisters and where they're at." When the visits are over, D.T. "gets upset and he gets mad. He doesn't want to go." D.T. cries and "tells me he doesn't want to go. He tells me he hates me and it's stupid."

Based on the record evidence, the section 366.26 report received August 4, 2015, and the adoption assessment received September 2, 2015, the court declined to apply the statutory exceptions to adoption for beneficial relationships between the minor and the parent, and minor and his siblings. The court made the requisite findings and terminated mother's parental rights.[5]

---

[5] The court also granted the foster parents' request for de facto parent status.

**DISCUSSION**

Section 366.26 provides in relevant part: "If the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption . . . [¶] . . . [¶] [unless] [t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. [¶]. . . [¶] (v) There would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(i), (v).)

*Continuing Beneficial Relationship Exception.*

Mother contends substantial evidence does not support the juvenile court's refusal to apply the beneficial parental relationship exception to D.T.'s adoption here. (See *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575) (*Autumn H.*).) She also argues the court abused its discretion, in that "the juvenile court's application of the facts to the law was arbitrary and capricious because the only reasonable inference was that [D.T.] would not benefit more from being adopted than he would from maintaining his relationship with mother."

"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H., supra*, 27 Cal.App.4th at p. 576.) We do not assess the credibility of the witnesses, reweigh the evidence, or resolve conflicts in the evidence

11

or in the reasonable inferences which may be drawn therefrom. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53.) The abuse of discretion standard is similarly deferential to the trial court's decision. " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) In our view, under either standard, or both (*In re K.P.* (2012) 203 Cal.App.4th 614, 621–622), mother cannot show trial court error.

*Autumn H.* states the beneficial parent/child relationship exception applies when "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated. [¶] Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

The condition precedent for application of the beneficial relationship exception is the maintenance of "regular visitation and contact with the child." (§ 366.26, subd. (c)(1)(B)(i).) The record here shows mother did not maintain regular visitation

12

throughout the dependency. Mother admits as much: " Mother acknowledges that she had not regularly visited with [D.T.] for a period of time preceding the section 366.26 hearing." She nevertheless asserts her "visitation and contact with [D.T.] was, for the most part, regular and consistent." The record shows otherwise.

In 2015, mother visited D.T. once and possibly twice in January, once in February, not at all in March, April, or May, once in June, once in July, and once in August. On September 22, mother testified she had last visited D.T. three weeks earlier at the Family Connection Center, and prior to that, two weeks earlier. It is not clear whether mother was referring to a late August or early September visit occurring after the August 13 visit and before September 22. Giving mother the benefit of the doubt, a total of five supervised visits between February 20 and September 22, 2015, do not add up to visits "pretty much every other week" for the past "couple of months."

D.T. was removed from mother's custody June 18, 2013, when he was almost two and a half years old. Mother's reunification services were terminated 11 months later, on July 16, 2014. Mother's argument is that D.T. should not be adopted because he recognizes her, calls her mom, is glad to see her when she does visit, enjoys playing with her and attends to her directions during visits, and is sad when the visits are over. As *Autumn H.*, *supra*, 27 Cal.App.4th 567, recognized, interaction between a natural parent and her child will always confer some incidental benefit to the child. However, the type of bond that overcomes the statutory preference for adoption is qualitatively different. "A parent must show more than frequent and loving contact or pleasant visits. [Citation.] . . . The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555, fn. omitted.)

13

Even assuming mother's spotty visitation in 2015 qualifies as regular and consistent visitation under the statute, we do not find error. To be sure, the record here shows D.T. has formed some level of emotional attachment to mother. However, on this record we cannot say the trial court was wrong to conclude that the positive interactions between her and D.T. during their supervised visits did not add up to more than "loving contact or pleasant visits." (*In re C.F.*, *supra*, at p. 555.) Nor can we say the court unreasonably inferred that D.T. looked to his foster parents, rather than his biological mother, for satisfaction of his needs for physical care, nourishment, comfort, affection, and stimulation. Under these circumstances, substantial evidence supports the juvenile court's finding that the benefits of adoption outweighed the possible detriment from severance of the parent-child relationship, and no abuse of discretion has been shown.

***Sibling Relationship Exception.***

Admittedly, the record shows a stronger bond exists between D.T. and his siblings, or at least his younger sibling, T.B. At age 13, I.M. is not "a kid person." Although she undoubtedly loves her four-year-old brother, she does not have much in common with him, is busy with other things in her life, and does not have much time to spend with him. A two-hour visit understandably feels like a four-hour visit to her. T.B., at age 9, likes D.T. "a lot." D.T. communicates with her and they enjoy playing together. We review the trial court's order declining to apply the sibling relationship exception to adoption under the same deferential standards of review. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315.)

An exception to adoption as the permanent plan for an adoptable child comes into play under section 366.26, subdivision (c)(1)(B)(v) when (1) termination of parental rights would substantially interfere with the child's sibling relationships and (2) interference with the sibling relationships would be so detrimental to the child as to outweigh the benefits of adoption. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 951–952.) The purpose of this exception is to preserve long-standing sibling relationships that serve

14

as "anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.) A parent appealing the termination of parental rights has standing to raise this exception. (*Id.* at p. 402.)

The statutory factors to be considered in determining whether this exception applies include, but are not limited to: (1) whether the child was raised in the same home as his or her siblings; (2) whether the child shared significant common experiences or has existing close and strong bonds with his or her siblings; and (3) whether ongoing contact is in the child's best interests, including his or her long-term emotional interest, as compared to the benefit of "legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) The focus of the exception is on the detriment to the otherwise adoptable child, not on the detriment to his or her siblings, from severance of the sibling relationship. (*In re Celine R.* (2003) 31 Cal.4th 45, 49–50, 54.) "The sibling's relationship with the child is not irrelevant. Certainly, evidence of the sibling's relationship with the child and, if the sibling is articulate, perhaps of the sibling's views of that relationship, might be relevant as indirect evidence of the effect the adoption may have on the adoptive child. . . . In an appropriate case, the court should carefully consider all evidence regarding the sibling relationship as it relates to possible detriment to the adoptive child. But the ultimate question is whether adoption would be detrimental to the adoptive child, not someone else. This conclusion does not mean that the court must totally disregard the interests of the sibling or the significance of the sibling relationship when it orders adoption. When appropriate, the court can encourage the adoptive parents to agree to visits among the siblings although, as the court recognized in this case, it cannot require them to do so." (*Id.* at p. 55.) "[T]he application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

Mother argues that D.T. and his siblings "share a significant sibling relationship." The trial court did not disagree; nor do we. D.T. lived with his sisters first in the family home and then in his first foster home, in which his sisters continue to live under legal guardianship. His second foster family and his sisters' guardian maintained ongoing visitation between them which, from all accounts, is positive for D.T. as well as for his sisters. Even the Department acknowledged "[D.T.] loves visiting with his sisters, and will sometimes say their names out of the blue at home."

Moreover, the trial court was entitled to consider whether adoption would necessarily mean the termination of D.T.'s sibling relationships. (See *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1017, disapproved on another point in *In re S.B.* (2009) 46 Cal.4th 529, 534. See also *In re Celine R., supra*, 31 Cal.4th 45, 50, 55.) Here, both sets of substitute parents have worked hard to foster and maintain the sibling bond. To all appearances, they will continued to do so. Mother speculates that D.T.'s current foster family might not adopt him after all and, in any event, there can be no guarantee the visits will be maintained going forward, with these or other adoptive parents.

However, the only indication in the record that D.T.'s adoption by his current foster parents might fall through is a mention in the social worker's report dated August 3, 2015, that several months earlier, in April 2015, the foster parents had "expressed some ambivalence about adoption" as compared with legal guardianship. They had since clarified at a meeting with the social worker in July 2015 their intention to adopt D.T. Due to the intensity and time-consuming nature of the home adoption home study process, and "the needs and present life stages of their other children," at least one of whom is adopted, the foster parents wished to delay starting the adoption process until February 2016. So far as the record shows, the foster parents' reservations about adoption did not reflect doubts about their ability to cope with D.T.'s special needs. On the contrary, D.T.'s foster parents "have continuously expressed a strong commitment

16

to [him]. They love him, consider him a member of their family, and cannot imagine him living anywhere else."

In the addendum report dated August 28, 2015, the social worker reiterated the foster parents "confirmed that they would like to provide [D.T.] with permanency through adoption." Further, she considered it "very likely" the foster parents would be approved to adopt [D.T.] since they had been approved for another adoption in 2012. Finally, the sincerity of the foster parents' resolve to adopt was supported by evidence from the guardian for D.T.'s sisters that only 10 or 11 days before the hearing, the two families met to talk about their plans for future visitation. In addition, the guardian testified *she* would do whatever *she* could to facilitate future visitation with whomever adopted D.T.

Of course, there is always the possibility, however remote, that an adoption might fall through, or that a different adoptive family might not feel the same commitment to continued contact and visitation between siblings, even if visitation were in the child's best interest. But under the circumstances present here, we cannot agree the trial court arbitrarily or speculatively concluded D.T.'s adoption by his current caretakers was likely, or that "whatever family ultimately adopts [D.T.] would sign on to continued contact."

In the last analysis, "even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption." (*In re Celine R., supra*, 31 Cal.4th at p. 61; *In re Naomi P.* (2005) 132 Cal.App.4th 808, 823.) *Naomi P.*, on which mother relies, does not help her here. In that case, the Court of Appeal applied the substantial evidence rule to the trial court's finding that the sibling bond in that case compelled a legal guardianship. (*Id*. at p. 824.) Here, the record before the trial court showed not only a sibling bond; it also showed that D.T.'s need for a stability and permanence in his life was acute. He had

17

been involved in the dependency system since birth, first under voluntary family maintenance services, then through failed reunifications with two parents, mother and Christine T. D.T.'s special needs continue to require special attention. Finding a permanent home to accommodate all three children, ages 13, 9, and 4, had been tried, and failed. As a result, D.T. was in his second foster care placement since his removal from his mother's home. D.T.'s 13-year-old sister poignantly underscored the importance of a stable home life for him when she testified "I feel, like, he shouldn't have to go through foster care his whole life and that it would be good for him" to be adopted. On this record, there was substantial evidence to support the juvenile court's finding the benefits D.T. would gain from the stability and permanence of an adoptive home outweighed the potential for detriment from substantial interference with his sibling relationships.

## DISPOSITION

The juvenile court's judgment is affirmed.

_____
DONDERO, J.

We concur:


_____
HUMES, P.J.


_____
BANKE, J.


A146578